All right, we're happy to hear argument in Tatum v. RJR Pension. And Mr. Lewis? Good morning, Your Honors. Jeffrey Lewis, representing plaintiffs Richard Tatum and the class. And I'm here with co-counsel Matt Bujaran, Robert Elliott, and Daniel Hutchinson. Your Honor, in your previous decision in this case, you stated that the extent of RJR's breach of fiduciary duty in this case Can you just be a tad louder or make the microphone louder? I'm sorry. Thank you. Yes, Your Honors. Is that better? In your previous opinion in this case, this Court stated that the extent of RJR's breach of fiduciary duty appears to be unprecedented in a reported case. It's undisputed that but for the decision of the fiduciaries here to force the plaintiff's participants to sell their Nabisco stock, The plaintiff's participants would have millions, the parties differ over how many, millions more dollars cumulatively in their retirement savings. This Court held that the District Court applied the wrong legal standard when it determined that RJR's unprecedented breach did not cause the participants' losses. This Court, however, noted that while it was possible that a fiduciary that acted, in this Court's words, Arbitrarily and with no research, as RJR did, would have made the same decision as a prudent fiduciary, Such blind luck, in this Court's words, would be rare. As a result, this Court instructed the District Court that defendants were to be held liable unless they could prove, By a preponderance of the evidence, that a hypothetical prudent fiduciary would more likely than not have forced the plaintiff's participants To divest their plaintiff's holdings in Nabisco stock at the time and in the manner that these fiduciaries did. The Court also stated that the District Court had focused too narrowly on the risk of a single stock and the risk of tobacco litigation, And that risk alone could not and did not warrant the divestiture of the stock. Rather, the Court stated that the Nabisco stock might very well continue to have been a prudent option in the plan If there were part of a diversified portfolio of options. In its opinion, this Court instructed the District Court to take into account on remand at least four things. One, the timing of the divestment decision. Two, the plan language in its unaltered form. Three, the character and aims of the plan, including its diversified options and its long-term nature. And four, the testimony of Professor Thomas Lease. But a fair reading of the Court's opinion on remand is that the Court stuck to its one-sided consideration Of the supposed risk of the Nabisco stock and disregarded this Court's mandate to consider these four facts and circumstances. The standard in this Court is that What standard did the District Court articulate? It articulated it would have standard, didn't it? It did say that, Your Honor, but in practice what it did was basically measure risk against and dismiss everything else. In the first opinion, Your Honor, the District Court said, very specifically, it was kind of a close question. Could have sold it, could not have sold it. But on remand, the District Court essentially said the same thing again. It said, well, they had to sell it. Couch did it, it would have standard, but did not consider the factors this Court indicated. The District Court articulated it would have standard and made the judgment under it. To say that notwithstanding everything you said, you didn't follow the mandate, it almost accuses the District Court of bad faith? I don't think bad faith is a question, Your Honor. It's not the standard. If you carefully parse, as we have, I believe, and demonstrated in the briefs, the District Court's opinion, the District Court simply ignored, for whatever reason, what this Court told him to take into account. Ignored it or just mentioned it, but didn't give any rationale for ignoring it. Was there any impediment to your presenting your expert witnesses before the District Court? Did you have a chance to present the evidence on your side? Well, the evidence, Your Honor, was already in the record before the remand. Yes, but I thought there was additional. No, there was no additional evidence. And we don't claim there was any impediment. The point is the District Court couched its decision, and superficial reading of it, which is, I think, would say the District Court weighed all the expert testimony. But the District Court did not really do that. It failed to weigh all the considerations this Court instructed to take into account, the four I just mentioned. And there were several additional things this Court said it should take into account. So on the timing, for example, Your Honor, this Court said that the defendants had the burden of proving that January 2000, in specific, was the time at which a hypothetical prudent fiduciary would have sold the stock. The District Court did not answer this Court's questions. What is our standard of review? De novo, Your Honor. That the District Court made that a reasonable prudent fiduciary would have made that decision. It's de novo, Your Honor, for three reasons. One is whether the District Court follows this Court's mandate is a de novo standard of review. Second is the District Court's application of law to facts, which is really what it probably did here, is also a de novo review under this Court's standards. So I think those are the applicable standards of review. But, you know, this question of timing, isn't that a factual issue? It would be if there was evidence, any evidence in the record. But that's your argument, but you're saying that our view is de novo, but it seems to me that with respect to the issue of timing, I understand your position to be that the District Court simply ignored the fundamental question of why was that particular date the optimum date in which to sell, instead focusing on the fact that it was an adequate amount of time to give notice to the shareholders. Now, I understand that argument. It suggests that the Court simply didn't answer the fundamental question. But that's still a factual issue, isn't it? Well, I think you could characterize it in a couple of ways, Your Honor. You could look at it that way, but you could also look at the District Court didn't truly follow this Court's mandate. Because I think what the Fourth Circuit has said is that the District Court must pay attention to all the rational reasoning, not just what the Court says, it's Court's reasoning, and give effect to the spirit of the mandate. Let me ask you about this timing issue, because as I understood the District Court's opinion, before it got to that question, it looked and analyzed the review, the competing testimony of the experts. And I guess one could say that implicit in that analysis was a finding by the Court that these stocks were simply too risky to hold at all. They had to be gotten rid of quickly because of the inherent dangers of single-stock funds. And then so the timing issue was simply one of providing enough time for the committee and for shareholders to be put on notice to allow that process to move forward. Why isn't that a rational conclusion to draw from this evidence? Because that, Your Honor, would directly contravene what this Court said in its prior opinion, which is that the risk of a single-stock fund is not enough to justify this decision, that there is no... I understand that, but I thought the Court also talked about the upside potential of the stock and concluded that that did not justify holding it for an extended period of time. Well, two points about that, Your Honor. Number one is, as this Court pointed out, selling it when it sold it locked in the losses. And actually a buy-and-hold strategy... Before, one could say prevented further losses, I suppose. You could say that, but even under the Court's reasoning, under the so-called efficient market theory, you can't predict that, that you would head off further loss or not. So, I mean, the point is that a buy-and-hold strategy in a plan which has a long-term purpose, which is one thing this Court instructed the District Court to take into account that it did not even mention, the plan has a long-term purpose. In that type of situation, a buy-and-hold strategy, as Judge Easterbrook said in the Seventh Circuit, is a rational, prudent thing to have. It's a legitimate investment strategy. So that's one point I would make in response to Your Honor. And the second point would be that there is no way to predict losses or gains by the District Court's own reasoning. Therefore, there is no good reason to sell it. If you can't predict losses or gains, but you know you're going to lock in the losses you already have... You know, I understand your view of the evidence, but this particular appeal seemed to me more straightforward and less complex than the previous appeal. The Court simply remanded the case. I mean, if it was all as clear-cut as you say, there would have been no need for a remand. And I understand that anything the District Court did that didn't go your way was going to generate another appeal. But, as I say, I thought this appeal seemed to me more straightforward, that the Court had remanded the case under a would-have standard. The District Court articulated a would-have standard. It looked at the expert testimony involved. It didn't make risk the exclusive factor, and we didn't exclude risk. And it comes back to us in a posture where at least some components of the District Court's decision, ultimately the would-have standard that we asked it to apply, are factual in nature, depending upon the weight that the District Court on remand placed on the different expert testimony. You can always try to make an issue of law out of a question of fact, and here I certainly don't begrudge you saying, well, it didn't follow the mandate. But surely this has some factual components to it, and it was remanded perhaps because the District Court did have a greater familiarity with the evidence and was more capable of applying the standard because of its factual grounding in the case. Well, I understand that as a general principle, but that is not what happened here, Your Honor, with respect. That is just not what happened. And just to go back to your question for a minute, Judge Diaz, I didn't finish answering it. The other point was the District Court compared risk to the possibility of extraordinary return. Nothing in this Court's decision in the reported case law or anywhere else justifies that as the decision. We didn't need to have extraordinary return in order to not lock in the losses. All you had to have was a reasonable possibility of ordinary return. But did this Court remand exclude some consideration of risk? No, it didn't. It didn't exclude it. But if you boil the District Court's decision down, Your Honor, and I understand what you're saying, is that the District Court over and over just said because you can't predict extraordinary return, which is not a legal standard or anything else, therefore the risk was too great. That's what it said over and over. And it did so in a contradictory fashion. It tried to rely on the efficient market theory, but it only relied on half of it. The efficient market theory, according to the Supreme Court in Dudenhofer, factors in the risk already. So the District Court said, well, efficient market means you can't predict extraordinary return. But on the other hand, here's this great risk. But the efficient market says that's factored in as well. And the Supreme Court said it. And the District Court – How do you interpret the Bancorp decision? Do you think it weighs in your favor? Yes, Your Honor. Well, defendants have already – this Court already rejected in its prior majority opinion the fact that Dudenhofer versus the Bancorp case changed the would-have, could-have standards. So I think that issue is put to rest. And if we need to come back to it, we will. But in other respects, I think Dudenhofer supports us because Dudenhofer says risk is already built into the market's assessment of a stock that trades on an efficient market. And therefore, for the District Court to elevate risk and take it out of that, while at the same time dismissing all – essentially dismissing all other considerations, I think was not following this Court's mandate. It didn't take into account the four – at least four things that we mentioned and we discussed in our briefs. And it didn't take into account what this Court said was Nabisco's solid fundamentals and excellent long-term business process. Before you – I see your time is up. But before you sit down, let me ask you about one of those other four factors, and that is the plan statement that prohibited divestment of the stock funds. Yes, sir. And obviously, we did indicate that that was something that the District Court needed to consider. But it's also, I think, as I understand it, not an absolute prohibition on a fiduciary ignoring that kind of language if it's in the best interest of the plan to do so. So what was the District Court supposed to do with that, in your view? It was supposed to take into account and weigh it as a factor. It can't be an absolute bar, right? No, it's not an absolute bar to them divesting. We agree, and we've never made that argument, Your Honor, and we didn't. But this Court specifically analyzed it and said this is something that needs to be taken into account. I'm having trouble figuring out how that's supposed to be accounted for. In this case, I guess one could say that the District Court implicitly accounted for that by deciding that a prudent fiduciary would have forged ahead notwithstanding that bar. That's not what the District Court said, Your Honor, though it gave two very flimsy, sorry to use that language, but flimsy reasons for ignoring it. One, it said, well, these fiduciaries would have changed it if they knew or they thought it was in effect. That's what the District Court said on that. And this Court said the District Court had to consider what a hypothetical prudent fiduciary would do in face of the unaltered plan language, not in face of speculating as to what it would have done or drawing conclusions. So the District Court didn't even really, it dismissed it as a factor entirely, which is one of the ways it did not follow the mandate. I had reserved the rest of my time, but I guess. Not right now. Okay. Thank you, Your Honors. Thank you. Boy, no one wants to come on in. Mr. Hahn. Good morning. Jeff Hahn for the Secretary of Labor. We are here to address an argument made by RJR that this Court has already rejected. In the last appeal, this Court explained that in Dudenhofer, the Supreme Court did not purport to establish the standard that a defendant, who has already been found to have breached its fiduciary duties, must meet in order to prove that its breach did not cause the plaintiff's losses, as RJR characterized Dudenhofer. Instead, Dudenhofer merely established a pleading hurdle for a plaintiff, and only for a very specific kind of complaint, alleging that a fiduciary ignored inside information, which the complaint here does not allege, as this Court pointed out in the last appeal. Now, RJR says that a recent three-page opinion from the Supreme Court in Amgen v. Harris has revealed that Dudenhofer really was about loss causation, and that this Court got it wrong. But Amgen also has nothing to do with loss causation, but merely applied Dudenhofer's pleading standard for inside information complaints to another inside information complaint. In fact, the Court in Amgen, just like in Dudenhofer, did not utter the word causation or cite any of the Circuit Court opinions on the topic of loss causation, including this Court's opinion, which RJR says has been overruled by Amgen. And the reason why Amgen does not mention causation is because the Dudenhofer pleading standard for inside information complaints has nothing at all to do with causation. They are analytically distinct concepts, as RJR admitted in its cert petition to the Supreme Court. And I think to understand this, it's important to understand how the— Tell me about that. RJR admitted in its cert petition? In its cert petition to the Supreme Court on the would-have versus could-have test, they noted that the Dudenhofer standard and loss causation are analytically distinct. And what I'll—and just to understand why that is the case, Dudenhofer—all Dudenhofer said was that because inside information or acting on inside information is so fraught with the potential for violating the securities laws and potentially for even causing the stock price to decline if the information is released onto the market, because of those very real concerns, a plaintiff who wants to claim that a fiduciary should have acted on the information only plausibly states a claim if the plaintiff can allege a viable way that the fiduciary could have used the information that was legal and that would not have caused undue harm to the plan. In other words, the plaintiff has to allege viable alternative actions the defendant could have taken with the inside information to make the claim plausible. That—even if the plaintiff has to prove that at trial, that there were these viable alternatives, that in no way disturbs the defendant's subsequent and distinct loss causation burden. The defendant would still have to show that despite— after a plaintiff has proven a breach in a related loss, that despite the existence of these viable alternative actions that could have been taken, the fiduciary defendant still would have used this court's standard, would have done exactly as the defendant did. So, I mean, to summarize, the Dudenhoffer standard for inside information complaints is—concerns the viability of alternatives to what the defendant did. The plaintiff has to plead viable alternatives, whereas the loss causation standard for defendants is about essentially proving the viability of what the defendant actually did. So they're analytically distinct concepts that work perfectly well together. And what RJR has really done with Amgen is taken language from Dudenhoffer applicable to the first concept, to the plaintiff's burden to plead viable alternatives, and applied it to the analytically distinct second concept of— on the defendant to prove the viability of what the defendant, in fact, actually did. So these are two separate things that have been, I think, wrongly conflated. And just to close the loop on Amgen, the only thing that Amgen added to the jurisprudence was quite modest, and that is that the Ninth Circuit had reversed the—I'm sorry, that the Supreme Court reversed the Ninth Circuit because in evaluating whether the inside information complaint in that case met the Dudenhoffer standard, the Ninth Circuit— on the previous appeal to say we remand to the district court with directions to enter judgment for the plaintiff. But the court didn't remand with directions for entry of judgment. It remanded with directions to apply the would-have as opposed to the could-have standard. Wasn't that remand in part a recognition that the district court had an insight into this case and a capacity to weigh the respective testimony of the experts and to make what is insignificant, or at least in many component parts, a factual standard, a factual finding? But, I mean, there was an alternative course if this whole matter was as clear as you presented. Well, this Court certainly remanded for application of the would-have standard in light of certain considerations, and I understand Mr. Lewis to be arguing that that was not done properly. Our only point here in this case is to say that the would-have standard was the right one all along and that this Court need not, should not revisit its holding in adopting the would-have standard in light of the Supreme Court's Amgen decision. Before you sit down, can I ask you a question? Is this issue with respect to the first third case and the asserted conflict with our would-have, could-have standard, is that a viable issue in front of the Supreme Court right now? It is not. And has any circuit rejected our view in a case like ours? I'm not aware that that's happened. In fact, I'm not sure if any court circuit has actually examined, as this Court did, the merits of the would-have versus the could-have approach. Well, the panel opinion has been cited with approval. Yeah, it has. But there's certainly no, as far as I understand, there's no circuit split on this question. Right. Okay. Thank you. Thank you. Thank you, sir. We appreciate it. Thank you. Mr. Thomas. Good morning, and may it please the Court. My name is Adam Charnas, and I represent the fiduciary defendants in this case. In the Court's prior majority opinion, the Court recognized on remand that district court might well enter judgment for defendants. This Court said, perhaps, after weighing all the evidence, the district court will conclude that a prudent fiduciary would have sold employees' existing investments at the time and in the manner RJR did because of the fund's high-risk nature, recent decline in value, and RJR's interest in diversification, and that is precisely what the district court did on remand. The district court's lengthy opinion carefully went through each of the factors that this Court instructed it to look at, as well as other factors it thought relevant. It made credibility determinations as between the parties' experts, who differed, not surprisingly, considerably, with each other about what the proper standard was, as well as how the evidence should be viewed, and it held that a prudent fiduciary, at the time, would have eliminated the DISCO funds at the time and in the manner that the defendants, the fiduciary defendants here, did so. All of, or nearly all, of plaintiff's arguments, therefore, are attacks on the district court's fact-finding. After all, when a district court makes a decision between two experts, that's a determination of fact, and those are all reviewed for clear error. And now, as the courts have repeatedly said. Can you show me the opinion where a, where the court analyzed how a hypothetical prudent fiduciary would have analyzed the DISCO's positive fundamentals? Well, yes, because what the district court said was. Can you give us the page number? Well, the district court dealt with the positive fundamentals. It recognized, but it said that because of the risk, the. Tell me where. Where? Okay. Well, it's throughout the opinion when it talks about risk. I mean, the. That's a different concept. Well, no, because it's clear that the, that the court discussed at length the analyst reports. And I don't, I can try and find the pages that was talking about that. The analyst reports were the basis for the plaintiff's argument that. Is there any direct language in the opinion where the court says, notwithstanding the DISCO's fundamental, positive fundamentals, a hypothetical, reasonable, prudent fiduciary would have sold a stock? Well, no, I don't think. I don't recall the district court saying it in those terms, but I don't think the district court was required to say. Wasn't the district court focused almost singularly on the risk of the stock? No, it was not. In fact, the district court spent a lengthy time talking about what the expected return for the funds were. Well, and to that point, it seemed to me that he was searching for evidence of extraordinary returns. That seems to me fundamentally wrong in this context. Well, he wasn't searching for it. The evidence, the testimony at trial by defendant's experts was, was two things related. First, that these funds were extraordinarily risky. And number two, that they were only expected to achieve ordinary returns. And what the district court said was, you could get the same returns as with the NABISCO funds, the same ordinary returns through the diversified mutual funds that were required, and those had much lower risk. So you had two funds. You had the NABISCO funds and other diversified funds that had the same level of risk, same level of return, expected return, ordinary expected return. But the NABISCO funds were much riskier. And as the restatement says, fiduciaries are commanded, required by their fiduciary duties, to achieve the lowest, to obtain the lowest level of risk possible for a given level of return. So since the returns were the same on the diversified mutual fund, the expected returns were the same because of the efficient market hypothesis and other things. Expected returns were the same on the two sets of funds, but the risk was much higher on the NABISCO funds. It was an easy call to eliminate. But what about the argument that, as with the positive upside of these stocks, the potential for, as you characterized it, extraordinary risk was already factored into the stock price? It is certain. There's no question that it's factored into the stock price. That doesn't eliminate the risk. So, for example. Nor does it eliminate the positive fundamentals of the stock. That's right. But that's certainly true. But, you know, this is a retirement fund. This is, people are planning for their retirement assets. As the Seventh Circuit said in the Summers case, which was an ERISA stock drop employee, employer stock drop case, fiduciaries of 401K plans are supposed to be cautious, not entrepreneurs. And if, you know, what the evidence before the court was, was that this had tremendous risk. One of defendants' experts, University of North Carolina finance professor, whom the district court quoted and relied on in his opinion, said this was a scary level of risk. Who was that? Professor McAnally. Okay. It was a scary level of risk, particularly in a retirement plan. And with the restating. Yes, the higher ups retained it in their plans. They did not, not in their retirement plan. In fact, some of the fiduciaries who participated in the plan had their Nabisco stocks eliminated just like. They retained stock, right? They retained stock or stock options outside of the plan. To the extent that they had the funds in the plan, which some of them did. It wasn't a wholesale sale by them. It was here. That's correct. But these were not retirement assets. They were trading on their own or not trading, making decisions on their own behalf, not on behalf of somebody else. They're the fiduciaries, right? And they know the risks better than anybody else. That's right, they do. And they're also quite have, their assets are quite a lot larger than the average factory worker at. That sounds like the risk would be greater. No, no, no. This is. More money in the fund. No, no. Their assets in general were. Total assets. There's no. I don't know. There's no evidence. A millionaire that likes to lose a few million dollars. No matter how many millions they have. Your Honor, there is no evidence in the record. You should bring the President in and ask him what he thinks of that. There's no evidence about the size of their investments outside the. You were just telling me about the size of their investments. No, no. I wasn't talking about the. Any more assets. Your Honor, I apologize if I was misleading. I was not referring. I misunderstood you. Sorry. I was not referring to their investments in the Nabisco funds. I was referring to their assets in general. The President of Reynolds certainly has more wealth than a factory worker. And the fact of the matter is that as Professor McAnally testified and the district court adopted this, this was a scary level of risk. Let me ask. So let's assume that that's. We accept that it's true. But we're looking at this single stock fund in the context of an overall portfolio. Correct. Of a number of funds that are extremely diverse. So what's. It seemed to me that the district court completely overlooked that. It seemed to be assuming that this was the only option for these retirement workers when, in fact, it was not. And in the context of a broader plan portfolio, what's wrong with having a, even as you describe it, a risky stock fund that workers can choose to invest in? What's wrong with that? Theoretically, there's nothing wrong with that. And the district court didn't say that it's a matter of theory. Well, tell me where in the opinion the court actually considered the overall portfolio. The court specifically found as a fact that the inclusion, the retention of the Nabisco, to Nabisco funds in the plan raised the level of risk for a vast majority of participants. And that was based on Professor, on Dr. McAnally, excuse me, Dr. Montgomery's trial testimony, one of the defendants' experts. And the district court specifically found that. That these funds were so risky that they increased the risk for the vast majority of participants. And it makes sense why. You can assemble. You can invest in individual stocks. If you invest in 15 or 20 individual stocks, if they're chosen properly, you have a diversified fund. It eliminates the individual variance, individual risk for a particular stock. No question about it. Let me go back to Judge Diaz's question. There's six funds in the overall portfolio, correct? Yes. All right. And two of those are non-employer single stock funds, Nabisco. There were two Nabisco and one RJR funds. There were three single stock funds overall. Well, but one was an RJR. That's right. And two were Nabisco. Correct. Now, in terms of the overall diversity, well, was there any expert testimony as to how employees sort of shop among funds or whatever? Or whether employees simply don't monitor the funds and just leave them with a single stock fund as long as that's available and sort of sitting there? I mean, to what degree are employees actually involved in comparison shopping among the funds? And to what degree does inertia and the like take over? Your Honor, I believe there were eight funds total, three single stock funds and five other mutual funds. But, yes, there was extensive testimony regarding participants, 401K participants' behavior. This was, and in fact, there was no dispute between the party's experts about this. Plaintiff's experts agreed that there is a high level of inertia among 401K participants. The vast majority of participants in this 401K plan, the evidence showed, made no changes in their plan at all. But for four or five years, not months, years before January 2000 when the stocks were eliminated, the fact of the matter is, for better or worse, the vast majority of participants in a 401K plan, the evidence of trial showed, don't pay attention to it. Their plans don't make changes. I think that's a critical point here. It might be one thing if you were an individual investor who's paying attention, like an officer of the company who is paying attention to your investments and makes a conscious decision, I'm going to bear this risk. But the evidence of trial, which the district court credited, was that the participants here, the vast majority of them, were not. When you step back, I mean, it's not inevitable to me that the district court would have sided with you, and it's not inevitable to me that the district court would have sided with the plaintiffs. But what I do see is that it did not seem to me that the district court's decision under the would-have standard, that its ultimate finding was an erroneous or impermissible one under the terms of the remand, because you do have non-employer, single-stock funds in a retirement plan where people don't continually monitor and comparison shop between the options available. And you do have a tobacco taint with the fund, which would operate as a drag in the foreseeable future. ERISA requires, or it certainly encourages, diversification in employee funds, and as you point out, it's a retirement fund. And, you know, had the ICON takeover not come along, or had the employees been left holding the bag because you have an Enron situation and the Nabisco stock tanked, then we would have had another lawsuit. But the question is not whether the district court took the only permissible view of the evidence, but whether under the terms of the remand it took a permissible view, and did it make a reasonable decision under the standard we set forth. And there are four or five reasons, not just the tobacco taint, but the fact that it's a retirement fund and the fact that these are single-stock funds, which are non-employee and non-employer funds. And I don't see how we can say what he did was just not a reasonable conclusion in light of all the expert testimony involved. That's the thing, not that you're right, but not that they're right, but it's the fact that you're not wrong, and it's the fact that they're not wrong. And as an arbiter between two sides that are not wrong, and that have a good bit to say on each side, it seemed to me that the district court has to be the arbiter of those kinds of close questions. I mean, that's the way I see it. I think that's right, Your Honor. And, you know, the district court sat through an almost five-week trial, and in his latest opinion made specific credibility determinations when deciding between the witnesses. For example, declining to follow some of Mr. Biller's testimony, expert testimony, because he found it to be less credible. And what the standard for clear error is, and I don't think this is controversial, is that if there's plausible evidence on both sides of the case, then the district court's decision on one side or the other cannot be clear error. And that's because of the discretion. I really do think we understand that. And the most helpful thing for me would be if you could directly address what sort of the – what I think of as the cavities, like the cavities in your teeth, the weak spots that Judge Diaz was asking you about, and what evidence there is and what findings there were with respect to those. Sure. Well, you know, the two things that Judge Diaz mentioned when Mr. Lewis was arguing was the timing and the plan language. I can address each of those. You know, there's no – I think, Judge, I think you had it exactly right in your questioning to my friend on the other side, which is that the district court determined that these funds, as I said before, were highly risky but did not offer returns higher than those available in other options in the plan, and then took a look about whether the timing was proper. And the district court expressly said that – inquired about – said in the fall of 1999, leading up to the planned divestment date, that prudent fiduciary would have decided to go forward with the divestment as planned, notwithstanding the changes that were happening in the marketplace. And, in fact, he pointed – the district judge pointed to evidence that the Nabisco funds were getting riskier as time went by and said that a prudent fiduciary, therefore, would have adhered to the decision. And that's in the joint appendix at pages 658 to 659. But that doesn't address the timing question, which the court earlier had found was completely arbitrary. And the question is, when do you do it? When does a reasonably prudent fiduciary actually divest? And the only answer to that question was by the district court, once the decision was made to divest, six months was a period long enough to give notice to all planned participants and coordinate the process of divestment. That doesn't answer the question as to whether or not a reasonably prudent fiduciary would have divested six months from now, taking into consideration potential upside of the stock versus the risk. I think he does more than that, though. He – what the court said was – it certainly said there's two questions, right? There's how much lead time do you have to give to participants. And that's important. I'm not – I'm not suggesting that's not relevant, but that obviously is not the only relevant. That's true. And page 666 of the joint appendix, he then wrapped it up by saying that a prudent fiduciary, looking at the changes in the marketplace, would have decided to go forward with a divestment as planned in light of those changes. So the court clearly understood that – Where is that? That's on page 666 of the joint appendix. And it's in the timing section of the finding exclusions of law. And it concludes at the bottom of the page that a prudent fiduciary would have retained the same timeline for the divestment. And that was – and that was based on, you know, the 63 pages of the opinion before that. And, you know, perhaps it's a fair critique of the district court's opinion that he didn't tie everything together with cross-references and so forth to make it as plain as possible what he was doing. But there's no question that he said that I have to decide whether the prudent fiduciary would have done this at the same time. Prudent fiduciary would have recognized all these changes that were happening in the marketplace, including the fact that the Nabisco stocks were getting riskier in part because of the tobacco litigation. The Nabisco stock fell something like 10 or 15 percent in one day after the – after an adverse decision in a Florida court. You know, the Nabisco stock, not RJR. And he said that a prudent fiduciary would have analyzed whether to go forward with a divestment and planned on this timeframe in light of any changes and concluded that at the bottom of the page that prudent fiduciary would have retained the same timeline for the investment. You know, I'm not sure how much clearer he could have been. He could have said retained the same timeline and eliminated on January 31st. But in context, that's clearly what the district court meant. Is it – we talk a lot about the tobacco taint on the stock and everything. How real is that? Because the companies had departed – had parted ways. And wouldn't the separation have insulated Nabisco from the tobacco taint to a considerable extent? I mean, RJR was sort of left on its own at this point. Well, that was certainly the theory or one of the theories of the spinoff. But the evidence of trial, which the district court accepted, was that the tobacco taint had not yet been eliminated. As I just mentioned, when the Engel decision came down in Florida, Nabisco – But why – I'm interested. Why would the tobacco taint have not – have not been eliminated after the – after the fact that the – after the point of separation? Well, there's really two reasons. First of all, NGH itself was a defendant in a lot of these tobacco cases. So separating from RGR kept them in – as a party in some of the cases. Were they in the tobacco cases as a party? Yes, and some of them they were. Many of them they were. But more fundamentally, when the spinoff was first announced in March of 1999, plaintiffs' lawyers, tobacco plaintiffs' lawyers, were quoted in the New York Times, and this is in the record, as saying it made no difference that if – for tobacco liability. Now, RGR did indemnify NGH for any tobacco liability it faced, but that was – that indemnification is only as good as RGR's credit, and there was – the testimony at trial was that there was substantial concern that RGR would need to declare bankruptcy, and the reason in this was that Florida law at the time, as was the law in a lot of states, required you to post a full bond for the full amount of any judgment. In the Engel case, the potential judgment against Reynolds was hundreds of billions of dollars, and, in fact, that judgment was later entered after Florida law on the bonds was changed. Another question here, and that is if there are six different funds in the pension plan and three of them – didn't you say three of them were mutual funds? I believe five of them were mutual. I'm talking about the three non-single stock funds. I think there were five non-single stock funds. Pardon me? I think there were five funds that were not single stock funds. They were diversified funds. There were five funds that were diverse funds. I believe that's correct. Okay. Did the district court consider the fact that there were diverse options for the participants in the pension plan, that if they wanted to, they had only to switch to one of the diverse options? Yes. I mean, the district court's opinions in this case clearly discussed those other ones, but the district court credited the expert testimony of defendants that the presence of the – notwithstanding the diversified funds, the presence of the two Nabisco funds increased the risk of the vast majority of plan participants. So it wasn't like the – And why would it increase the risk of the majority of plan participants when there were diverse options to be readily had? Because those participants stayed in the Nabisco funds, notwithstanding the very high risk of those funds. So, you know, and again, as we referenced before, Your Honor, you know, if participants were making a conscious decision to accept this risk, you know, that might – that's one thing. But here we know, and plaintiff's experts admitted this, there's a remarkable degree of inertia for 401K participants. They're just – we just know they're not – fiduciaries know they're not paying attention. And fiduciaries have an obligation to devise the plan in a way to ensure that it provides adequate return and adequate protection to participants. The management or the top employees of Nabisco did not divest themselves of their Nabisco stock. What significance do you attach to that? Well, we don't think it has any significance in the case. First of all, these were not retirement assets to the extent that the fiduciary – individual fiduciaries had assets in the plan. They were divested like everybody else's. There's no evidence that they had any other choice. And they're in a very different situation than participant factory workers, for whom the 401K is their entirety of their retirement assets other than, you know, what they might get in Social Security. I would like to briefly return to the second point that Judge Diaz, that you raised with Mr. Lewis, and that's the plan language. You know, you could quibble with whether the district court got it right on the plan language. But there's no question that the district court considered the language of the plan. The district judge expressly recognized that the plan's terms informed its inquiry, as this court had instructed. That's at page 661 of the joint appendix. And it devoted four pages, 660 to 663 of the joint appendix, discussing the plan language. And what it basically concluded at the end of that discussion was that notwithstanding the – and this is at page 663 – that notwithstanding the plan language, that a prudent fiduciary would have eliminated the funds. And it was pointed out – I can't remember who pointed this out – under ERISA, a fiduciary is required to follow the plan language except if it's inconsistent with ERISA. And the courts have repeatedly said that fiduciaries can depart from the plan language when they believe that their fiduciary duties require them to do so. And we believe that's exactly what the district court – that a prudent fiduciary would have moved forward notwithstanding the plan language. Page 663 of the joint appendix, which is page 61 of the court's opinion, failure to obtain consent in lieu of meeting – and that's a discussion about whether the November amendment was valid. So it's saying – basically saying the invalidity of the November amendment does not affect the termination of the substantive issues addressed by a prudent fiduciary. And he goes on to say whether, you know, discussing a number of factors. So I think the court is saying there that notwithstanding that language, that a prudent fiduciary would have eliminated the funds. So in the course of that discussion, the district court seemed to find it significant that the parties and prior courts and everybody else thought the plan said something else. Do you think that that's significant? The plan says what it says, right? Well, right. So I think what the district court was getting at – as I read the district court's opinion, he sort of made – the court made two different findings. The court said, first of all, a prudent fiduciary reading the plan would have believed that the – would have believed the November amendment was validly adopted because I, the district judge, and the parties for years and years didn't – didn't notice that the November amendment did not have the proper technical signatures. And then he went on, I think – Usually when there is a mistake of fact, we don't say, well, that's all right, because everybody thought it was different, right? Well, the question is what – We don't. You know, this – Judge Motz, in your opinion in this case, page 364, the court articulated what was to be done on remand in two different ways. I am really familiar with it. I'm sure you are. And the second way is that the question that you said was whether a planned fiduciary carries its burden of demonstrating that it would have reached the same decision. So the court – And that – what I was questioning you about was the paragraphs before that, where, as I say, the district court seemed to attach significance to the fact that everybody had misread the documents in the record to date. And I'm just not sure that that's so significant. And I wondered if maybe you could tell me why you think it is. Or if you agree with me, that's fine, too. Well, I think it's – I think the district court, as I said a moment ago, I think the district court has alternative holdings. I think the district – as I read the opinion, the district court says what we just talked about, that a prudent fiduciary would have believed the November amendment was valid and would have acted accordingly. But I believe the district court also was – went on to say it doesn't really matter because of the other evidence, a prudent fiduciary would have eliminated the funds, notwithstanding it. Now, the first holding, I think, is – goes to the language in this – in Tatum 4, the panel's – the court's prior opinion that I just quoted, focusing on what these fiduciaries would have done in the same situation if they had done a proper investigation. So I think that's why the district court believed that that discussion was appropriate and proper. Thank you. Goodbye. Thank you, Mr. Charnas. Thank you. Mr. Lewis, we're pleased to hear from you on rebuttal. Thank you, Your Honor. I want to start with the last point here because actually what this court directed the district court to do was to analyze whether not these fiduciaries, but a hypothetical prudent fiduciary would have done. And in specific, it had to find that it was more probable than not – not whether this – you could weigh it either way – more probable than not that a hypothetical prudent fiduciary would have divested the stock at the time in the manner that the district court did – that the defendants did here. Mr. Lewis, one thing that this – there's a danger here in, I think, reviewing this case that we've become very, very semantic and it can get – sometimes I worry about the semantics taking over from the practical exigencies in which the fiduciaries found themselves. Yes. Well, that is a risk, Your Honor. But let me just talk about that because one area where I think it's not semantic, Your Honor – I didn't get to complete my question. Oh, I'm sorry, Your Honor. I thought you were done. I took your pause for completion. I'm – but I'm still very interested in having you respond to the first third of my comments. Go ahead. Well, Your Honor, this is not a question of semantics. Let me give you another example of why it's not. This Court made clear that the decision that had to be analyzed here was a decision to divest, which was not the same as a decision to invest. That's quite clear in this Court's opinion. And, in fact, in – let me – if I could finish. There's not been an expert testimony that the two were comparable. Well, there was some, but actually the district court – and this shows you the lengths to which – I don't know any other way to put this. A decision to – I just thought there was expert testimony that a decision to divest was comparable to a decision not to buy. No. Not that the district court's – No. That's wrong, Your Honor. – decision changed on that, but I thought there was expert testimony to that. No. That's incorrect. Defendants quoted a secondary source, which went on to say that there were additional factors. And in its first opinion, Your Honor, in this case, the district court said the decision to divest involved additional considerations based on Dr. Biller's testimony, plaintiff's expert's testimony. And the district court, in its attempt to get around this Court's mandate, basically contradicted its prior opinion based on no expert testimony. I think that's not semantics, whether divest versus indest. This is a real substantive issue, Your Honor. And there were – Let me just say – get back to the whole question of – of hindsight. Because any time the fiduciaries – if the fiduciaries fail to divest and the Nabisco stock falls, either because of the tobacco taint or some other factor, then the fiduciaries are going to face one sort of legal action. Because you said, well, you should have been aware of this. These were three single-stock funds. How could you just let them sit without taking steps to diversify them and put the employees in a more protected position in a context in which their whole retirement depended on that? That's one lawsuit that awaits them. But then they divest and the Nabisco stock rises. And then they get another kind of lawsuit, which is you didn't make a – you didn't make a prudent decision with respect to the decision to divest. So just put yourself in the place of a fiduciary, which I know is hard to do. But no matter what you do, you get clobbered in hindsight from – from one side or the other. No, you don't, Your Honor. And you don't – well, first of all, I am a fiduciary of about a billion and a half dollars of trust funds, and I have been in this place. And I'll tell you what you do. You do a proper investigation. You analyze all the factors. And the courts have made clear, including this court, that if you follow the proper procedures and do a proper investigation, you cannot be second-guessed for hindsight. But this court has already determined that the fiduciaries here in unprecedented degree breach the – We're not disputing that. The procedural aspect of this is part of the – excuse me, Mr. Lewis. The procedural aspect of this is a part of the case, but yet the case was remanded to the district court to make a finding under these – under this standard. Well, it was, and it didn't make the right finding, not because I disagree solely with the weighing all the evidence, but because the district court disregarded this court's mandate. And I want to talk about – there was discussion about the plan language. The district court did just dismiss the plan language, and it dismissed it on grounds of what these subjective fiduciaries thought, what they thought was in the plan, how they might have amended the plan. That's not following the mandate, Your Honor. Following the mandate is saying, okay, it's a factor that I'm taking into consideration. It's not dismissing it by looking at – it's not dismissing it entirely based on specious reasoning, which has – which doesn't follow this court's decision. The court – and in answer to a couple of the questions that came up during Mr. Charnes' presentation, the district court never discussed Nabisco's strong fundamentals and excellent long-term business prospects. You know, one of the testimonies that I elicited from one of the executives here, Mr. Engowitz, at trial that's in the record, was I asked him if he had any concern about Nabisco's long-term prospects, and he said, this is Oreo cookies, counsel, and I think that sums it up somewhat. This was a fundamentally sound company. The district court did not weigh that factor at all. The district court also did not discuss the diverse options in the plan. When it got to that issue, all it said was, well, there was RJR stock and Nabisco stock, and it compared it to RJR. It did not address the fact that there are other options. And whether participants make good decisions or bad, or they don't touch their stock, or they do, is something that we have to – if you want to quarrel with something, defendants should quarrel with Congress about that, because Congress, in setting up this type of plan and allowing participants to exercise choice – as somebody who is out to circumvent the mandate and do a runaround. But remember, this is the same district judge who held a five-week trial, or whatever it was on the first, and didn't side with the fiduciaries on every count. He said at the earlier trial that the fiduciaries had not done the investigation or followed the procedures that they should have. And so it's not – it doesn't seem to me that this was a district judge that was either going to give short shrift to the case after the lengthy trial that he held, or was going to protect the fiduciaries at all costs because he made the finding on the procedures, which was an important part of the earlier majority opinion. So, you know, I really take some – I realize that every time a remand doesn't result in a favorable result, there's always disregard of the mandate. But I do take some exception, because I think this is a very conscientious district judge that treated this case conscientiously and didn't rule one way or the other on this or that or the rest. And I just disagree with Your Honor. I think it's not conscientiousness. It's not conscientiousness question. The first – the district judge's first decision finding that procedural prudence was violated was obvious. I mean, this Court said it was almost unprecedented in reported cases. That was kind of a no-brainer, Your Honor. And I'm not saying the district court didn't take the case seriously, but the district court was focused on this causation question. Excuse me, Mr. Lewis. Sorry. We just disagree on whether the district court did what the earlier opinion said. Correct. And that's correct. Can I ask you, was there a hearing? Pardon me? Was there a hearing? Yes, there was a brief hearing. We rebriefed it. There was no new evidence. Right, no new evidence. But you had oral arguments? We had some oral arguments, Your Honor, yes. And at the end of the district – my memory of it was the district court said, so if I find everything equal, I have to fine for plaintiffs. And I thought that was what was going to happen, because I don't think it was even equal. Do you have anything further, Mr. Lewis? I have nothing further. If you have some final comment or statement. I'm fine, Your Honor. Just that I think if you step back from this and look at this Court's opinion and look at the district court's opinion, it's quite clear the district court did not follow the letter or the spirit of this mandate and that it should be reversed on that ground alone. And I think that if you look at all the facts and circumstances, both the ones the district court ignored and the other ones that we pointed out in our brief, that a district court judge could not have reached the decision this judge did. And I think the Court should order judgment in our favor on liability. Is the transcript of the oral argument in the papers, in the J.A.? I don't know the answer to that question. I don't think so. Does anybody know? I don't think it is, Your Honor. All right. I'm seeing negative nods of the head at both sides of the table. It must be. You know the answer to that. Right. Okay. Thank you, Your Honor. Thank you. Do you have further questions? No. I'll leave further questions. I'd like to thank each one of you and tell you how much we appreciate your argument. And then we'll come down and greet you and then move into our next case.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Albert Diaz